We'll hear argument next in number 2010-1432, Mitsubishi Chemical Company against Barr Laboratories. May it please the court. I'm sorry, Mr. Iceberg. Go ahead. Thank you, Your Honor. May it please the court. I'll first address the issue of why claims 1 and 2 are anticipated. Then address claims 3 and 4, which turn on the issue of claim construction. And finally, obviousness. Suppose we were to conclude that 1 and 2 are valid or that 3 and 4 are valid. Do we have to reach the question about the other claim? Claims 1 and 2 are the method of dissolving. From our perspective, as a commercial matter, if any of the four claims are held to be valid, we can't make the product. So we have to show that all four claims are invalid. And with respect to 1 and 2, that turns entirely on the translation issue? No, Your Honor. No? We accept completely, for purposes of this appeal and this argument, that we win on the basis of the translation by Mr. Cross, which was submitted by Mitsubishi. And the reason is, is that the method that was adopted by the district court, using the Cross translation, has a fatal error in it. And I think the best way of seeing that error is in the appendix in Volume 2 at Exhibit… Wait a moment. That sounds as though you're saying the Cross translation is wrong. No, Your Honor. I'm saying that the Cross translation we're accepting as correct. That's the one the district court relied upon. You're saying it demonstrates that the claim is anticipated. Yes. And the reason that the district court made an error is because, based on the Cross translation and Dr. Byrne's testimony, the district court made a fatal error in how it understood how the solution was made. And I can show you that fatal error because it is in Volume 2 of the appendix at page A2535. This is an exhibit which was used during Dr. Byrne's direct testimony. 2535? Yes, Your Honor. This is an exhibit which was used during Dr. Byrne's direct testimony as to the way in which one of skill in the art, according to him, using the Cross translation, would make the solution disclosed in Yamamoto. This is the method adopted by the district court. And we know that because it's in the district court's opinion, paragraph 218 on A99. Dr. Byrne explained in his testimony, and this is in the record at A3655, that based on the Cross translation, the way in which you make the solution disclosed in Yamamoto is you start with a beaker that has dilute hydrochloric acid in it, at a pH of 1.5 to 1.7. You add the agatroban. It all dissolves. Then you add ethanol and sorbitol. And according to Dr. Byrne, that makes the solution described in Yamamoto. That's at A3655. That's the method adopted by the district court. On cross-examination, what Dr. Byrne told the court, told me on cross, but didn't tell the court on direct, was that when you add the agatroban, the agatroban reacts with the acid. This is at A3751 to A352. And because the agatroban reacts with the acid, the pH will rise, and it will rise above. So this is on the theory that you would add additional acid at the end to adjust the pH. It's not a theory. In this case, Dr. Byrne's testimony… The answer is yes, right? The answer is it's exactly right. That Dr. Byrne admitted on cross-examination that under his method, you would also have to, after you added the agatroban, also have to check with the pHs that the pH would rise. He admitted that it's possible the pH would also be affected by the sorbitol and the ethanol. And therefore, he admitted that the final step in this process would have to be testing the pH and adding additional hydrochloric acid. That difference in the method that Dr. Byrne described on cross is a fatal error not reflected in the district court's opinion. And the reason it's fatal is that once that testimony is accepted, that both experts agree that you have to add hydrochloric acid at the end as a final step in all cases, the reasons the district court accepted one method and rejected the other begin to fall like cards. The first card that falls, the district court said, I'm rejecting Byrne's method because it has too many steps, and these steps are not shown in Yamamoto. That reason is not valid anymore. The number of steps under Dr. Byrne's approach, now that he's admitted that you have to check and add more hydrochloric acid at the end, collapsed. The number of steps are the same. The second card that falls, the district court said, I'm rejecting Byrne's approach because that would require that you have a suspension. Dr. Byrne and Dr. Needham both agreed that if you added agatroban to a solution that contained water, ethanol, and sorbitol, some amount of the agatroban would dissolve, and the rest would be dissolved at the end when you added the hydrochloric acid to lower the pH to the required 1.5 to 1.7. Why does the district court reject the idea that you could use this middle step of creating suspension? The district court tells us. This is in the district court's opinion at A3667. Sorry, I'm sorry, district court's opinion at A98, paragraph 214. And here's what he says. It is customary, according to Dr. Byrne, that for the authors to state if the material involves making a suspension, because there is no reference to a suspension in Yamamoto, the district court said that method was therefore prohibited. That reasoning doesn't apply to Yamamoto. There are a couple of prior art references, one Yamamoto, the other Kumada. In Yamamoto, there is no step-by-step explanation about how to make the solution. The solution is certainly described, but no step-by-step process. In Kumada, however, there is a step-by-step process. There's a section on preparation of drug solution in Kumada at page 861 of the record. And that preparation involving agataban was published in the same journal simultaneously with Yamamoto. Is this going to the issue of anticipation? Yes. But you're referring to two references here. Yes. And the reason I'm referring to the reference is that— Which is the reference that you're picking for anticipation? Yamamoto. Right. So you can't say, well, Yamamoto in connection with another reference, right? No, and I'm not trying to combine the two. Okay, good. What I'm saying is the district court's criticism of Yamamoto was it didn't have a step-by-step explanation about how things are made. Sorry. The district court's criticism of Yamamoto was it didn't have an express statement that one of the steps would be to create a suspension. That criticism, I think, is unfairly applied to Yamamoto because Yamamoto doesn't have any description at all of what the individual steps are. So it's unfair to criticize Yamamoto for not expressly stating that one of the steps is a suspension. And I think the way in which I can demonstrate where that criticism would be applicable is if you take a look at Kumada, which is also for a gator band. Kumada does have preparation of drug solution steps. Kumada says you add water to a gator band, you create a suspension, and then you add the hydrochloric acid at the end dropwise in order to solubilize. So for the district court to understand Yamamoto, Kumada provides a roadmap to one of skill in the art to provide the steps that Yamamoto doesn't expressly provide. The third error of the district court concerns ethanol. The district court found, this is A59, A60 of the record. The teaching of the prior closest art to a gator band is that ethanol would reduce the solubility of a gator band. The district court said, quote, there is no prior art to refute the fact that the addition of ethanol decreased the solubility of a gator band. That is flat wrong. Mitsui, which was prior art before the district court, says exactly that. It says it in connection with a publication regarding a gator band, not regarding some general's with an eye on publication. It says it about a gator band. And Mitsui says at 806, after various investigations, it was found that a high concentration drug could be formed by dissolving in a low pH ethanol solution. Twice more, the Mitsui article talks about the high concentration being formed by dissolving it in acidic ethanol. And Mitsui discusses how it wanted a high concentration because it had advantages for the use it was using in dialysis. And Mitsui also tells us that he wasn't happy about having to use ethanol. He was concerned that by using the ethanol and using the pH, this might have an adverse effect on patients. And Mitsui is happy to report that he tested this. And because of the dialysis process, the ethanol did not show up on the bloodstream. So when the district court says there is no prior art which teaches that ethanol increases the solubility of a gator band, that finding is contradicted by Mitsui. And when the district court discusses Mitsui, the only thing the district court focuses on is that it was a low pH solution. And essentially ignores the fact that it was a low pH ethanol solution. What do we conclude from this? I suggest four things. The science, as explained by Dr. Byrne on cross-examination, which was ignored by the district court. And the prior art tells us that the method adopted by the district court for how one skilled in the art would create the solution in Yamamoto does not work. Because it will not give us the required pH of 1.5 to 1.7. First fatal mistake. Second, the difference in steps between the Byrne approach and the Barr approach that the district court said was one of the reasons he was rejecting Barr's approach. That difference in steps, number of steps, doesn't exist anymore. The number of steps are the same. The order may be a little different. Third, the criticism that you cannot use a suspension in Yamamoto because it doesn't expressly state using a suspension doesn't apply to Yamamoto. Because Yamamoto doesn't purport to set out the steps the way Kumada did. And finally, that the prior art teaches for a gatterban that ethanol increases the solubility of the gatterban. And the district court's finding to the contrary cannot stand in light of Mitsui. And that's why the district court found that ethanol could not be part of the solvent system. And that's another reason why the district court's exclusion of ethanol as part of the solvent system cannot stand in light of the prior art. When those corrections are recognized, the prior art tells us how one of skill in the art would make the solution in Yamamoto. And it tells us that the ethanol is part of the solvent system. And it tells us that the hydrochloric acid is added last, as it must be to have a pH of 1.5 to 1.7. And it is for that reason that based upon the cross-translation, Yamamoto anticipates and renders invalid claims one and two. Okay. Thank you, Mr. Iceberg. We'll reserve the remainder of your time for rebuttal. We'll hear from Mr. Conlon. May it please the court. Well, I'm confused. I thought this was an anticipation case. And yet, in order to get the interpretation that Mr. Iceberg wants to get, he has to have a roadmap from the Kumada reference. And you have to look at the Matsui reference to figure out what it means. The fact is that there was never really any testimony by Dr. Needham or anyone else that would show how Dr. Needham's theory of the case would apply under the cross-translation. He looked at it and said, well, that doesn't change my theory.  This is the first probable attempt that we've had to have that happen. But the fact that this is really based on aspects that are contrary to the reference and to the record. So, for example, he said you have to add pH at the end. That has to be. But if you look at the testimony of Dr. Byrne, he said, well, yes. When you add the argotraban, the pH would go up. We don't know how much. If you add the ethanol and you add the sorbitol, I would expect it wouldn't go up at all. But it might go up a little. But there's no testimony that would go outside the range of 1.5 to 1.7. No testimony to that at all. And that's not what you're hearing today. To transition to another point, these claims 1 and 2 don't require any particular amount of ethanol, right? That's correct, Your Honor. So wouldn't it be true that they would cover a lot of inoperative embodiments? I don't believe that's been raised per se, and I don't think that they would. I think what this is about is you can show that all three of these elements, if they're all there, they always give surprising results because they always have a solubility that's higher than water, even as you take the curve right down to 1 mg per ml, which is pure water. All of these things show unexpected results as long as you've got the three elements of the claim. And that's something that was testified to, and it's evident if you look at the patent in the figures 3 and 4. It shows that the whole range is a tremendous range of materials. It doesn't take it down to zero. It doesn't take it down to zero, but I think there's other things in the record that talk about that. But the point is there's no evidence that it doesn't work right down to the point of 1 mg per ml. And if you look at the level of ethanol and the level of sorbitol in the ultimate product, as it sits when it's used with a patient, it's similar. It's better. It's higher than water would be. So I don't think there's any evidence in the record that there would be inoperable, if all three of the elements of the claim are there, that it would cover inoperable subject matter. The issue that was raised here is a little bit… I think basically if you look at Dr. Burns' testimony, he said, yes, it's dissolved. When you first put it in, it's dissolved in acid. And the most that Mr. Reisberg could get out of him in this cross-examination is, you might do a little adjustment at the end. And a little adjustment at the end does not take this out of the teaching of Yamamoto being contrary to the claim that we have here. It's dissolved in acid before it ever sees any ethanol and before it sees any sorbitol. So this reference, it doesn't teach much. And it certainly doesn't teach the claim method of claims one and two. The testimony of Dr. Burns is shown at 36.56 and 36.55. He talked about when, to some extent, his testimony at 8.37.52 agreed that the dissolution of our gutter bound would raise the pH to some extent. But he specifically said, we don't know how far. If you look at ACE36.59 to 36.60, he said, I don't believe that ethanol or sorbitol would change the pH at all. They're both neutral molecules. But if there was some little adjustment, it would be quite easy to do that, to adjust the pH by looking at a pH meter. Now, Mr. Reisberg is counting eight steps. If you look at his brief, he says there are eight steps in Dr. Burns' approach. And there are nine steps in Dr. Needham's approach. But he's counting his steps looking at a pH meter. The point is that what Dr. Burns says is you have the acid. You add the our gutter bond. It's dissolved. And then the other things are put in. You can make that into eight steps if you watch their hand while they're pouring it, I suppose. But I don't think you can make eight steps out of what he actually did. If it's dissolved before it sees ethanol and sorbitol, then any little adjustment at the end is not going to adversely affect the solution. It's not going to change what happened. And it's not going to retroactively make this into an anticipation of claim one. Since that's the only issue that they raised, I surely would love to talk about a number of other issues. But that's the only issue they raised on their oral argument. I think that's really met. And what does he mean when he says that you've got to look at Kumada because that provides a roadmap for how to interpret Yamamoto? As Your Honor pointed out, we're talking about anticipation here. And this is quite an unusual case because in this record, bar specifically this claim to the court, any reliance on Yamamoto for any obviousness purpose, they do not contend that Yamamoto would have made the claimed invention obvious in view of anyone else, any ordinary skill in the art, alone or in combination with any other reference. Yet, in order to try to establish anticipation here, you have to use a roadmap from one of the references. And you have to interpret the Matsui references saying, oh, well, ethanol solvated, made it easier. But the testimony about Matsui is clear, and the judge had rulings on that. Matsui teaches against this because Matsui dissolved things because he put acid into the system. The same is true of Numata. They both used acid in the system. So you have sets of references that conclusively say that the expectation in the art for dealing with a molecule, a zwitterion of this type, would be that the addition of ethanol would decrease its solubility. The addition of sorbitol would decrease its solubility. And you have a teaching of Matsui and the other references that use acid to get solubility. That doesn't teach using ethanol to get solubility. They've got ethanol in there, but they don't indicate that that increases solubility. They now admit for the first time that Cross controls Needham's testimony. But all he said when he talked about Cross is that his theory, Mr. Needham, did not testify as to how Cross could possibly apply to his theory. The whole theory all the way through here is they were trying to reject Cross. They showed Dr. Needham Cross, and he said, yes, I've looked at that. It doesn't change my mind. That's not enough factual evidence, expert testimony that would support adoption of Dr. Needham's suspension theory. In lieu of the obvious way that Yamamoto talks about dissolving this, they specifically say you dissolve it in acid. So that doesn't deal with that. I think as far as the suspension theory, Kumada tells us something that is also the subject of Dr. Byrne's testimony. Dr. Byrne testified, it's standard. If you're going to have something where you're talking about making a solution to something and you're going to generate a suspension, you mention it in the article. It's going to be a publication that's going to technical publications. And Kumada shows that to be true. Kumada actually said they owned up to the fact that they had to make a suspension. That disclosure is totally missing from Yamamoto. And to say that that proves that Yamamoto didn't have to do it because Yamamoto didn't list the steps kind of begs the question. Yamamoto didn't disclose any steps other than dissolving it in acid and putting that into ethanol and sorbitol after it was dissolved. So, Your Honors, I think that we've responded to their proposal today. I think that the suggestion that the house of cards, that the district court laid forward falls is not really an adequate description of the meticulous way that the district court analyzed every aspect, every nuance of the evidence in this case. They've never attempted even to talk about his 60 pages of analysis of the obviousness issue. The district court was tremendously… I think that's what Matsui is directed at. That's the only place where they talked about Matsui up until today, Your Honor. So, I believe that the decision of the district court speaks for itself. It really is very thorough, very correct. Contrary to the suggestions, it's not something where he decided the result and then only amassed the testimony to support it. It's clear that he analyzed it. He sat there every day. He listened to the witnesses. This doesn't deal with the fact of the credibility of the witnesses. And that kind of finding can't really be reversed by this court. And let me just say one other thing. Let's say, for the sake of amusement, that the court were to adopt Dr. Needham's approach and say, well, Dr. Needham explained how this could be done. At that point, you would have Dr. Needham saying one way and Dr. Byrne saying the other way. I don't think the court can really change all the factual findings that where the court adopted what Dr. Byrne did because it went along with the science it talked about. All the science just gelled with it. And so if that were the case, then clearly Yamamoto would be ambiguous. If it covers more than one interpretation and only one of the interpretations could possibly be used to anticipate, then it's ambiguous and an ambiguous reference clearly does not anticipate. Thank you, Your Honor. Thank you. We'll hear about two minutes left, Mr. Iceberg, for rebuttal. Thank you, Your Honor. First, on anticipation, we rely upon Yamamoto and Yamamoto alone. Under the law of anticipation, how one of skill in the art is going to make the solution described in Yamamoto depends on that person's knowledge, depends on the knowledge of a person's skill in the art, what steps would they use. It is for that reason that we look at Mitsui, which tells us that ethanol is part of a solvent system. And it's for that reason that the district court's rejection of using a suspension is not allowable because one skill in the art would know that you could use a suspension. As to the issue of whether or not Byrne's addition of hydrochloric acid as a final step is optional, we'll stand by the record, Your Honor, and his testimony at pages 3751 to 52 and 3756. It wasn't optional. He admitted on cross it was going to be required in all cases. And that means that the method as described in the district court's opinion, for that reason alone, is wrong because it will not give the solution disclosed in Yamamoto. And that's a ground for reversal alone. Third, Byrne did testify as to the cross translation. That is in the record at 2874 to 75. He said it makes no difference. And in fact, Byrne's testimony is more consistent with the cross translation. Mr. Cross, the translator, said you cannot translate Yamamoto as saying that it was the agar-agar band was dissolved in hydrochloric acid. The translator said that would be incorrect. The translator said because in the Japanese, it says that it was dissolved under the condition of low pH. And that's completely consistent with Dr. Byrne's, sorry, with Dr. Needham's way, and it's totally inconsistent with the district judge. In fact, the district judge said you dissolve it in hydrochloric acid when the translator said that's the wrong translation. And finally, on the issue of obviousness, I just didn't have enough time to get to it on direct. We do combine the 192 patent with Mitsui. The 192 patent, as the district court recognizes, teaches every element of Claims 3 and 4. It's a pharmaceutical composition that's administered by injection. The only element missing is ethanol. And when you combine it with Mitsui, one of skill in the art would know that you could increase the concentration of the solution of the 192 patent simply by adding a weak hydrochloric acid ethanol solution. And that anticipates Claims 3 and 4. Thank you. Well, it renders them obvious. I'm sorry, renders them obvious. Thank you. Thank you, Judge. We thank both counsel. The case is submitted.